**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JUDICIAL WATCH, INC.; ILLINOIS FAMILY ACTION; BREAKTHROUGH IDEAS; and CAROL J. DAVIS, | |
| Plaintiffs, | No. 24 Civ 1867 |
| v. | Judge Sara L. Ellis |
| THE ILLINOIS STATE BOARD OF ELECTIONS; and BERNADETTE MATTHEWS, in her capacity as the Executive Director of the Illinois State Board of Elections, | |
| Defendants. | |

## FIRST AMENDED COMPLAINT

Plaintiffs Judicial Watch, Inc., Illinois Family Action, Breakthrough Ideas, and Carol J. Davis ("Plaintiffs") file this First Amended Complaint for declaratory and injunctive relief against the Illinois State Board of Elections and its Executive Director Bernadette Matthews, in her official capacity ("Defendants").[1]

1.      Plaintiffs seek declaratory and injunctive relief to compel Defendants to comply with their voter list maintenance obligations under Section 8 of the National Voter Registration Act of 1993 ("NVRA" or "Act"), 52 U.S.C. § 20507.  Plaintiffs also seek reasonable attorneys' fees, litigation expenses, and costs, which are available to prevailing parties under the Act.  *Id.* § 20510(c).

---

[1] The Court permitted Plaintiffs to file an amended complaint in Doc.68 and Doc. 69 at 22.

**JURISDICTION AND VENUE**

2.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States, and in particular under 52 U.S.C. §§ 20507 and 20510(b).

3.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a defendant resides in this district and all defendants reside in Illinois, and because a substantial part of the events and omissions giving rise to the claims herein occurred in this district.

**PARTIES**

4.     Plaintiff Judicial Watch, Inc. ("Judicial Watch") is a not-for-profit, educational organization incorporated under the laws of the District of Columbia and headquartered at 425 Third Street SW, Suite 800, Washington, D.C. 20024.

5.     Plaintiff Illinois Family Action (IFA) is a non-profit political advocacy and lobbying organization incorporated under the laws of Illinois and headquartered in Tinley Park, Illinois.

6.     Plaintiff Breakthrough Ideas (BI) is a non-profit advocacy organization incorporated under the laws of Illinois and headquartered in Wheaton, Illinois.

7.     Plaintiff Carol J. Davis is a resident and lawfully registered voter in DuPage County, Illinois.  Ms. Davis is a member of Judicial Watch.

8.     Defendant Illinois State Board of Elections (the "State Board") is an independent state agency created under the laws of the State of Illinois.  Defendant State Board is responsible for supervising the administration of registration and election laws throughout the State.

9.     Defendant Bernadette Matthews is the Executive Director of the Illinois State Board of Elections and the Chief State Election Official of the State of Illinois.  She is sued in her official capacity.

## STATUTORY BACKGROUND

10.     Section 8 of the NVRA provides that "each State shall … conduct a general program that makes a reasonable effort to remove … from the official lists of eligible voters" the names of voters who have become ineligible by reason of death or a change of residence.  52 U.S.C. § 20507(a)(4).

11.     With respect to voters who have changed residence, Section 8 provides that no registration may be cancelled on that ground unless the registrant either (1) confirms this fact in writing, or (2) fails to timely respond to an address-confirmation notice described by the statute (the "Confirmation Notice").  52 U.S.C. § 20507(d)(1).

12.     A Confirmation Notice must incorporate a "postage prepaid and pre-addressed return card, sent by forwardable mail," asking the registrant to confirm his or her residence address. *Id*. § 20507(d)(2).  If a registrant fails to respond to such a Confirmation Notice, and then fails to vote (or contact the registrar) during a statutory waiting period extending from the date of the notice through the next two general federal elections, the registration is cancelled.  *Id*. § 20507(d)(1)(B).  These cancellations are mandatory under both federal and state law.  *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 767 (2018) ("federal law makes this removal mandatory" (citations omitted)); 26 Ill. Adm. Code § 216.50(b) (registration "of an inactive voter who has not voted in two consecutive general federal elections shall be canceled at the completion of procedures set forth in Section 8(d)").

13.     Federal and state regulations refer to voter registrations as "inactive" when a registrant has failed to respond to a Confirmation Notice and the statutory waiting period has commenced but has not yet concluded.  11 C.F.R. § 9428.7; 26 Ill. Adm. Code § 216.20.

14.     A voter with an inactive registration may still vote on election day.  52 U.S.C. § 20507(d)(2)(A).  Accordingly, inactive voters are still registered voters.

15.     In June of each odd-numbered year, the U.S. Election Assistance Commission ("EAC") is required by law to report to Congress its findings relating to state voter registration practices.  52 U.S.C. § 20508(a)(3).

16.     Federal regulations require states to provide various kinds of NVRA-related data to the EAC for use in its biennial report, specifically including:

   a.  The "total number of registered voters statewide" in the most recent election, "including both 'active' and 'inactive' voters."  11 C.F.R. § 9428.7(b)(2).

   b.  The "total number of registrants statewide that were considered 'inactive'" in the most recent election.  *Id*. § 9428.7(b)(4).

   c.  The "total number of registrations statewide that were, for whatever reason, deleted from the registration list" between the last two elections.  *Id*. § 9428.7(b)(5).

   d.  The "statewide number" of Confirmation Notices mailed between the last two elections, and "the statewide number of responses received" to them.  *Id*. § 9428.7(b)(8).

17.     Section 8(i) of the NVRA grants the public the right to request information concerning voter list maintenance.  It provides: "Each State shall maintain for at least 2 years and shall make available for public inspection" and copying "all records concerning the

implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i).

18.     Though not purporting to be an exhaustive list, Section 8(i)(2) provides specific examples of responsive records: "The records maintained . . . shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made." 52 U.S.C. § 20507(i)(2).

19.     Under Illinois law, Defendant State Board has "general supervision over the administration of the registration and election laws throughout the State." 10 ILCS 5/1A-1. Its powers and duties include: "(2) Disseminat[ing] information to and consult[ing] with election authorities concerning the conduct of elections and registration …"; "(6) Requir[ing] such statistical reports regarding the conduct of elections and registration from election authorities as may be deemed necessary"; "(7) Review[ing] and inspect[ing] procedures and records relating to conduct of elections and registration as may be deemed necessary, and [] report[ing] violations of election laws …"; "(8) Recommend[ing] … legislation to improve the administration of elections and registration"; "(9) Adopt[ing], amend[ing] or rescind[ing] rules and regulations in the performance of its duties …"; and "(12) Supervis[ing] the administration of the registration and election laws throughout the State." 10 ILCS 5/1A-8. Illinois law further provides that the State Board may "by regulation delegate any of its duties or functions under this Article," although "final determinations and orders under this Article shall be issued only by the Board." *Id.*

20.     Illinois law provides that the "centralized statewide voter registration list required by … the Help America Vote Act of 2002 ("HAVA") shall be created and maintained" by Defendant State Board. 10 ILCS 5/1A-25.

21.     HAVA requires the centralized statewide voter registration list to be updated to remove ineligible registrants from the list "in accordance with the provisions of the National Voter Registration Act," including "subsections (a)(4), (c)(2), (d), and (e) of section 8 of such Act." 52 U.S.C. § 21083(a)(2)(A)(i).

22.     The NVRA provides that "[e]ach State shall designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under this chapter." 52 U.S.C. § 20509.  Illinois law designates the Executive Director of the State Board as the Chief State Election Official.  26 Ill. Adm. Code § 216.100(b).  Illinois law further provides that Executive Director "may issue such opinions or directions as he or she deems necessary to insure that" the NVRA and provisions of the Illinois Administrative Code dealing with voter registration "are implemented uniformly throughout Illinois."  *Id.* § 216.100(c).

23.     The NVRA affords a private right of action to any "person who is aggrieved by a violation" of the Act.  52 U.S.C. § 20510(b).  Ordinarily, a private litigant is required to send notice of a violation to the chief State election official 90 days prior to commencing a lawsuit.  *Id.* § 20510(b)(1), (2).  However, notice of only 20 days is required "if the violation occurred within 120 days before the date of an election for Federal office," and no notice is required if a "violation occurred within 30 days before the date of an election for Federal office."  *Id.* § 20510(b)(2), (3).

## FACTS

### *The Data from the Latest EAC Report*

24.     On June 29, 2023, the EAC published its biennial, NVRA-related report, entitled ELECTION ADMINISTRATION AND VOTING SURVEY 2022 COMPREHENSIVE REPORT, A REPORT FROM THE U.S. ELECTION ASSISTANCE COMMISSION TO THE 118TH CONGRESS, available at https://www.eac.gov/sites/default/files/2023-06/2022_EAVS_Report_508c.pdf.

25.    Along with this report, the EAC published the responses it received to a voter registration survey it sent to the states.  The survey is available at https://www.eac.gov/research-and-data/datasets-codebooks-and-surveys under the heading for 2022, at a link entitled "2022 Election Administration and Voting Survey Instrument."  States, in consultation with their own county and local officials, certified their answers to this voting survey directly to the EAC.

26.    States' responses to EAC surveys are compiled in datasets available online in several different software formats, at https://www.eac.gov/research-and-data/datasets-codebooks-and-surveys.  Responses to the most recent survey were published on June 29, 2023.  They are available online under the heading for 2022 as "EAVS Datasets Version 1.0."[2]

27.    The largest number of outdated registrations subject to removal under the NVRA almost always belong to those who have changed residence.  For this reason, the largest number of removals under the NVRA are usually made pursuant to Section 8(d)(1)(B), for failing to respond to a Confirmation Notice and failing to vote in two consecutive general federal elections.

28.    The data Illinois certified to the EAC shows that 11 counties removed zero voter registrations from November 2020 to November 2022 pursuant to Section 8(d)(1)(B).  The 11 counties are Christian County, Clark County, DeKalb County, Johnson County, Lee County, Macon County, Marshall County, Pike County, Stark County, Union County, and Washington County.

29.    The data Illinois certified to the EAC showed that 12 other counties removed 15 or fewer voter registrations from November 2020 to November 2022 pursuant to Section 8(d)(1)(B). These 12 counties are Bureau County (1 removal), Edwards County (12), Franklin County (11),

---

[2] An updated version of the initial responses ("EAVS Datasets Version 1.1") was published on the same webpage on December 18, 2023, to account for new information submitted by Delaware, Hawaii, West Virginia, and Wisconsin.  The Illinois data was unchanged.

Hamilton County (5), Henry County (10), Lake County (8), Marion County (12), Ogle County (11), Piatt County (15), Pulaski County (6), Putnam County (5), and Randolph County (4).

30.    In all, these 23 counties reported a combined total of 980,089 voter registrations as of November 2022.  Yet they reported removing a combined total of 100 registrations in the last two-year reporting period pursuant to Section 8(d)(1)(B) because the registrants failed to respond to a Confirmation Notice and failed to vote in the next two general federal elections.

31.    In Plaintiffs' experience, based on years of enforcing the NVRA, these are absurdly small numbers of removals under Section 8(d)(1)(B).  There is no possible way these counties can be conducting a general program that makes a reasonable effort to cancel the registrations of voters who have become ineligible because of a change of residence while removing so few registrations under Section 8(d)(1)(B).

32.    According to the Census Bureau, 11.8% of Illinois residents are not living at the same residence address as they were one year ago.

33.    According to the Census Bureau, 297,005 Illinois residents moved out of state in 2023 (the most recent year for which such data is available), and 344,027 Illinois residents moved out of state in 2022.

34.    If the identified counties were complying with Section 8(d)(1)(B) of the NVRA, the number of registrations they remove pursuant to that provision in any two-year period should be much higher.  In particular, that number should never be zero, in any jurisdiction.

35.    As a point of comparison, Stephenson County, Illinois, with a much smaller total of 28,385 voter registrations in November 2022, removed 5,214 registrations pursuant to Section 8(d)(1)(B) in the last two-year reporting period.

36. As a point of comparison, tiny Pope County, Illinois, with 2,772 voter registrations, removed 175 registrations pursuant to Section 8(d)(1)(B) in the last two-year reporting period. That is still more voter registrations than were removed under that provision in all 23 identified counties *combined*.

37. The fact that Illinois' own data shows that more than one fifth of its counties removed few or no registrations under Section 8(d)(1)(B) for failing to respond to a Confirmation Notice and failing to vote in the next two general federal elections establishes a statewide failure to conduct a general program that makes a reasonable effort to cancel the registrations of voters who have become ineligible by reason of a change of residence.

38. Illinois also informed the EAC that another 34 jurisdictions simply failed to report any data whatsoever regarding Section 8(d)(1)(B) removals in the most recent reporting period, indicating instead "Data not available." These are Adams County, Alexander County, Brown County, Cass County, Chicago City, Clay County, Clinton County, Cook County, Crawford County, Douglas County, East St. Louis City, Fayette County, Gallatin County, Greene County, Grundy County, Jefferson County, Kane County, Kankakee County, Knox County, LaSalle County, Logan County, Mason County, McDonough County, Mercer County, Monroe County, Morgan County, Perry County, Richland County, Scott County, Vermilion County, Warren County, White County, Winnebago County, and Woodford County.

39. Nineteen of these 34 jurisdictions also failed to report any data regarding registrations removed on account of the death of the registered voter. These 19 are Alexander County, Clay County, Clinton County, Cook County, Fayette County, Gallatin County, Grundy County, Knox County, Logan County, McDonough County, Mason County, Mercer County,

Monroe County, Chicago City, Perry County, Richland County, Scott County, Warren County, and Winnebago County.

40.     In Plaintiffs' experience, jurisdictions do not ignore their reporting obligations to the EAC where the data is favorable to them.  Rather, they often fail to report data that suggests non-compliance with the NVRA.

41.     The fact that Illinois admitted to the EAC that almost one third of its counties and cities did not report data concerning removals under Section 8(d)(1)(B) for failing to respond to a Confirmation Notice and failing to vote in the next two general federal elections establishes a statewide failure to conduct a general program that makes a reasonable effort to cancel the registrations of voters who have become ineligible by reason of a change of residence.

42.     The sending of Confirmation Notices is a necessary first step under Section 8(d)(1)(B) to removing the outdated registrations of voters who changed address.  The failure to respond to this notice makes the registration inactive and starts the NVRA's statutory "clock," after which the registration is cancelled.

43.     Illinois informed the EAC that 29 of its counties failed to report any data regarding the number of Confirmation Notices sent during the period from November 2020 to November 2022, indicating instead "Data not available."  These counties are Alexander County, Boone County, Brown County, Champaign County, Clay County, Clinton County, DeKalb County, Fayette County, Franklin County, Gallatin County, Greene County, Grundy County, Henry County, Johnson County, Kankakee County, Logan County, McDonough County, Mercer County, Monroe County, Montgomery County, Ogle County, Richland County, Schuyler County, Scott County, Union County, Warren County, Wayne County, Williamson County, and Winnebago County.

44.     The fact that Illinois admitted to the EAC that more than one fourth of its counties did not report data concerning the number of Confirmation Notices mailed establishes a statewide failure to conduct a general program that makes a reasonable effort to cancel the registrations of voters who have become ineligible by reason of a change of residence.

45.     If a registrant does not respond to a Confirmation Notice, the registrant is marked inactive.  Accordingly, the number of inactive registrations is a critical indicator of whether Confirmation Notices are being sent and followed up and, in general, whether a jurisdiction is complying with the NVRA.

46.     Illinois informed the EAC that 22 jurisdictions did not report any data regarding the number of inactive registrations on their rolls during the relevant period from November 2020 to November 2022, reporting instead "Data not available."  These are Adams County, Alexander County, Brown County, Clay County, DeKalb County, Fayette County, Grundy County, Johnson County, Knox County, LaSalle County, McDonough County, Mercer County, Monroe County, Morgan County, Piatt County, Pike County, Randolph County, Rockford City, Shelby County, Stark County, Union County, and Warren County.

47.     The fact that Illinois admitted to the EAC that one fifth of its jurisdictions did not report data regarding the number of inactive registrations establishes a statewide failure to conduct a general program that makes a reasonable effort to cancel the registrations of voters who have become ineligible by reason of a change of residence.

48.     Fifty-two of 108 Illinois' jurisdictions failed to report any data to the EAC in one or more of the crucial data categories identified above, *viz*., relevant statutory removals, Confirmation Notices, or inactive registrations.  This shows a statewide failure to comply with reporting obligations embodied in federal regulations, including 11 C.F.R. § 9428.7.

49.     In all, 66 of Illinois' 108 jurisdictions—or 60% of them—either reported fewer than 15 Section 8(d)(1)(B) removals, or failed to report one of the crucial data categories (relevant statutory removals, Confirmation Notices, or inactive registrations) identified above.

50.     These 66 jurisdictions contain a total of 5.8 million registered voters.  These amount to about 66% of Illinois' reported 8.8 million voter registrations.

51.     The foregoing facts establish a statewide failure to conduct a general program that makes a reasonable effort to cancel the registrations of voters who have become ineligible by reason of a change of residence, and establish a statewide failure to enforce the NVRA, for which Defendant State Board and Defendant Matthews are liable.

### *Facts Arising from Correspondence*

52.     On August 4, 2023, Plaintiff Judicial Watch wrote a letter to Defendant Matthews discussing the data Illinois had reported to the EAC.  It asked that she confirm whether the data concerning low removals in 23 counties was accurate, and, if it was not accurate, to supply correct data.  It also asked her to supply the missing county or city-level data about Section 8(d)(1)(B) removals, Confirmation Notices, and inactive registrations.  The letter did not purport to be a pre-suit notice of violation or to start a notice period described in 52 U.S.C. § 20510, but was styled as an "Inquiry and request for public records."  This letter is attached hereto as Exhibit 1.

53.     Judicial Watch's August 4, 2023 letter also requested six categories of public records pursuant to Section 8(i) of the NVRA.  The first request, quoting the language of Section 8(i)(2), sought a list "of the names and addresses of all persons to whom notices described in 52 U.S.C. § 20507(d)(2) [*i.e.*, Confirmation Notices] were sent, and information concerning whether or not each such person responded to the notice."

54.     On September 1, 2023, counsel for Defendant Matthews responded by letter.  This letter is attached hereto as Exhibit 2.

55.     Defendants' September 1, 2023 letter did not confirm whether the data concerning low removals in 23 counties was accurate, or supply corrected data.  Instead, the letter stated that Defendant State Board was not obligated to respond to Judicial Watch's inquiries.

56.     Defendants' September 1, 2023 letter admitted that Defendant State Board "does not have access to local election authorities' list maintenance records."  The letter added that "[a]ny request for more information regarding specific jurisdictions' list maintenance activities and/or EAVS survey statistics should be made [] directly to the local election authority."

57.     Defendants' September 1, 2023 letter further stated that "local election authorities, not SBE, maintain lists of all voters to whom a forwardable confirmation of address notice has been sent."

58.     Defendants' September 1, 2023 letter, and a subsequent communication a few days later, produced public records in response to Judicial Watch's requests.  However, in response to Judicial Watch's request no. 1, for records concerning the mailing and disposition of Confirmation Notices—which are specifically identified as responsive records by Section 8(i)(2) of the NVRA— the letter admitted, "SBE does not possess documents responsive to this request, as explained above."

59.     The NVRA and related federal regulations require the State of Illinois, and not its counties, cities, or local authorities, to maintain and make available statewide records of Confirmation Notices sent and of responses to them.  52 U.S.C. § 20507(i) ("Each State shall …"); 11 C.F.R. § 9428.7(a), (b)(8) (chief state election official "shall" report the "statewide number" of Confirmation Notices and "the statewide number of responses").

60.     Defendants cannot conduct a general program that makes a reasonable effort to cancel the registrations of voters who have become ineligible by reason of a change of residence, unless Defendants have access to local election authorities' list maintenance records, and, in particular, access to their data and statistics concerning (1) removals of registrations under Section 8(d)(1)(B), (2) the mailing and disposition of Confirmation Notices, (3) the number of inactive registrations on their voter rolls, and (4) their responses to the EAC's biennial survey.

61.     Defendant Matthews cannot fulfill her statutory duty as Illinois' Chief State Election Official to be responsible for the coordination of State responsibilities under the NVRA, unless she has access to local election authorities' list maintenance records, and, in particular, access to their data and statistics concerning (1) removals of registrations under Section 8(d)(1)(B), (2) the mailing and disposition of Confirmation Notices, (3) the number of inactive registrations on their voter rolls, and (4) their responses to the EAC's biennial survey.

62.     The NVRA supersedes and preempts any Illinois law or practice that

    a.     restricts Defendants' access to local election authorities' list maintenance records, including access to data regarding the cancellation of registrations, the mailing of and responses to Confirmation Notices, and the number of inactive registrations;

    b.     diminishes the responsibility of the Chief State Election Official to coordinate State responsibilities under the NVRA;

    c.     assigns ultimate responsibility for conducting NVRA-mandated list maintenance to city or county officials; or

    d.     assigns ultimate responsibility for performing NVRA-mandated public record obligations to county, city, or local officials.

63.     Requiring a party who is or may be aggrieved by a violation of the list maintenance provisions of the NVRA to individually contact 108 Illinois counties and cities to set forth its concerns, make inquiries, or serve statutory notice-of-violation letters, and to follow up as may be necessary in each of those jurisdictions—including, perhaps, by means of multiple lawsuits— makes NVRA enforcement exponentially harder in Illinois, and effectively allows statewide officials at the State Board, including the designated Chief State Election Official, to duck responsibilities assigned by federal law.

64.      Requiring a party who seeks a specific set of public records guaranteed by Section 8(i) of the NVRA to individually contact 108 Illinois counties and cities to make the same requests, and then to follow up in each of those jurisdictions depending on their responses, makes using the NVRA public records provision exponentially harder in Illinois.  It also makes the process much longer, in that a full statewide response will always depend on the slowest of 108 jurisdictions.

65.     The list maintenance provisions of the NVRA, which help ensure that voters will neither be wrongly removed from the rolls nor have their votes nullified by ineligible voters, promote the fundamental right to vote, and enhance voter participation.

66.     The public records provisions of the NVRA embody Congress' conviction that the right of Americans who are eligible to vote must not be sacrificed to administrative chicanery, oversights, or inefficiencies.  Making these provisions harder to enforce contravenes the will of Congress and injures the public.

67.     Illinois has previously attempted to thwart the purposes of the NVRA.  In *Ill. Conservative Union v. Illinois*, 2021 U.S. Dist. LEXIS 102543 (N.D. Ill. June 1, 2021), the plaintiffs challenged the State's requirement that restricted electronic access to the centralized statewide voter registration list to political committees and governmental bodies.  The Illinois law

effectively forced members of the public to view Illinois' millions of voter registration files one at a time on a computer screen at the Springfield office of the State Board during business hours, without being able to copy, query, or otherwise obtain the data electronically. The plaintiffs were held to have stated a claim that Illinois law frustrated the NVRA's purpose and was superseded by federal law. *Id.* at \*19-20.

68. Defendants' September 1, 2023 letter further stated that "Electronic Registration Information Center ('ERIC') participation is the cornerstone of Illinois' voter list maintenance scheme."

69. ERIC is a non-profit that purports to assist both with encouraging new voter registrations and identifying outdated ones, including by comparing registrations among its member states.

70. Participation as a member of ERIC does not ensure compliance with the NVRA.

71. ERIC recently has been plagued by accusations of partisanship and ineffectiveness and has been rapidly losing member states.

72. ERIC's membership currently includes 24 states and D.C., which together contain only 40% of the total U.S. population.

73. According to the Census Bureau, the greatest number of Illinoisians who left the state in 2023 moved to (in order) Indiana, Florida, Wisconsin, Texas, and California. Of these, only Wisconsin is currently a member of ERIC.

74. Defendants' September 1, 2023 letter admitted that any data obtained "in cooperation with ERIC" by cross-referencing various databases is merely shared with local election authorities. It is left to those authorities to "confirm any matches and make the required updates to the applicable voter records."

75.     In order to comply with the NVRA, election officials must not merely identify potentially ineligible registrants, they must actually remove them from the voter rolls.

76.     As demonstrated by the 23 Illinois counties who reported removing from zero to 15 voters from the rolls pursuant to Section 8(d)(1)(B), Illinois election officials are manifestly failing to remove ineligible residents from the voter rolls.

77.     On November 15, 2023, Plaintiffs sent a letter to Defendant Matthews in her capacity as Illinois' Chief State Election Official, notifying her of violations of the NVRA and threatening this lawsuit unless those violations were cured within 90 days.  The letter expressly stated that it constituted the pre-suit notice prescribed by 52 U.S.C. § 20510.  It is attached hereto as Exhibit 3 (the "Notice Letter").

78.     The Notice Letter repeated the allegations contained in Judicial Watch's August 4, 2023 letter.

79.     The Notice Letter also observed that, "[c]omparing the data your state reported to the EAC regarding the total registration numbers for each county to the U.S. Census Bureau's most recent five-year estimates of the numbers of resident citizens over the age of eighteen suggests that 15 Illinois jurisdictions have more voter registrations than citizens of voting age."  Such high registration rates suggest a statewide failure to conduct a general program that makes a reasonable effort to cancel the registrations of voters who have become ineligible by reason of a change of residence.

80.     The Notice Letter also alleged a violation of Section 8(i), based on Defendants' admission that they did not have the records described in Section 8(i)(2), which the NVRA expressly requires states to maintain and provide.

81.     In subsequent communications responding to the Notice Letter, Defendants have never confirmed whether the data concerning low removals in 23 counties was accurate, have never supplied the corrected data, and have never produced records concerning Confirmation Notices in response to request no. 1.  Instead, these communications made legal arguments, and sought to favorably recharacterize the foregoing facts, asserting, for example, that only a "handful" of Illinois jurisdictions failed to remove registrations or report data.

82.     Illinois' official voter lists contain many more outdated and ineligible registrations than they would if Defendants complied with Section 8(a)(4) of the NVRA.

### *The Interests of the Plaintiffs*

83.     Plaintiff BI is a 501(c)(4) policy advocacy and education network that advances the causes of peace, prosperity, and freedom by highlighting the virtue of taxpayer-centric and liberty-focused policies and how they benefit all community members.

84.     BI has three full-time employees and one part-time employee.  It has a limited budget, and it relies on volunteers for many of its activities.  It has to make hard choices about how to use its limited resources.

85.     BI's core activities include engaging in public advocacy and education about its core issues; persuading voters to support favored policies and candidates with money, volunteer services, and votes; setting up mailings and door-to-door "walk programs" for political groups and candidates who work with BI; and contributing funds directly to candidates it prefers.

86.     All voter address lists used by BI and by those it works with to contact Illinois voters are ultimately based on Illinois' official voter list.  The Illinois voter list itself is always the least expensive way for cash-strapped causes or candidates to reach out to voters.

87. BI's ability to conduct each of its core activities has been made more difficult because Illinois' voter rolls contain more outdated and ineligible registrations than they would if Defendants complied with Section 8(a)(4) of the NVRA.

88. BI periodically engages in targeted mailings concerning specific issues or elections, and expects to conduct such targeted mailings in the future. BI also works with political groups and candidates in setting up their own mailings.

89. Mailings are expensive.

90. In general, mailings to a particular, valid address can only be expected to generate a response after three to five pieces of mail have been sent to that address.

91. In every mailing based on addresses from Illinois' voter list that BI participated in or knows about, a significant proportion of mailings were returned as undeliverable because the addressee no longer lives at the stated address.

92. The proportion of mailings to addresses from Illinois' voter list that is returned as undeliverable is greater than it would be if Defendants complied with Section 8(a)(4) of the NVRA.

93. The cost of mailings to addresses taken from Illinois' voter list that are returned as undeliverable represents an economic loss, and is part of the reason mailings are so expensive.

94. Another way BI and the political groups and candidates it works with reach out to voters is through "walk programs," which use paid employees to go door to door to contact voters directly with a political message or to get out the vote. Walkers are paid on a "per door" basis, that is, based on the number of addresses they visit, regardless of whether they contact the voter they intended to reach.

95. Like mailings, "walk programs" rely on voter addresses from Illinois' voter list.

96. At some addresses visited by members of a "walk program," the current resident confirms that the person sought does not reside at the stated address.

97. At a large percentage of addresses visited by members of a "walk program," there is simply no response. But based on the rate of returned mailings BI and the candidates it supports have observed when they conduct mass mailings, it is likely that many of these addresses where no resident is contacted are out of date.

98. The cost of paying members of the "walk program" to visit addresses from Illinois' voter list where the addressee has moved represents an economic loss.

99. The proportion of addresses visited by members of the "walk program" that do not result in any voter contact because the addressee has moved is greater than it would be if Defendants complied with Section 8(a)(4) of the NVRA.

100. Because of the additional costs of mailings and of conducting door-to-door visits caused by Defendants' failure to comply with Section 8(a)(4) of the NVRA, BI and those it works with obtain fewer results from such expenditures than they would if the voter rolls were better maintained. That is, it costs more money to contact fewer voters, either by mail or in person. This impairs BI's ability to effectively perform its core activities of public advocacy and education, setting up mailings and door-to-door "walk programs" for political groups and candidates who work with it, and reaching out to voters.

101. Because of the relatively higher costs of mailings and door-to-door programs, BI and those it works with have relied more heavily on social media and billboards than they otherwise would.

102.    Unlike mailings and door-to-door visits, social media cannot be used to contact every voter.  In particular, it often fails to reach older members of the public.  These older individuals are often invested in politics and are willing and financially able to contribute.

103.    Billboards obviously do not reach every voter, but only those who drive by them. Billboards cannot be used to convey a lengthy or complex message.

104.    Because BI and those it works with rely more heavily on social media and billboards than they otherwise would, BI's abilities to perform effectively its core activities of public advocacy and education, setting up mailings and door-to-door "walk programs" for political groups and candidates who work with it, and reaching out to voters, are impaired.

105.    BI also contributes money directly to candidates it prefers.

106.    BI knows that these candidates, many of whom are low on resources, use Illinois' voter lists for their own programs to contact voters to ask for contributions, volunteer services, and votes.

107.    BI's contributions to candidates have less impact due to additional costs those candidates experience in their mailings and door-to-door efforts because Illinois' voter lists contain more outdated and ineligible registrations than they would if Defendants complied with Section 8(a)(4) of the NVRA.  Stated differently, BI must contribute more money to have the same impact on a candidate's efforts at voter outreach, because of Defendants' non-compliance.

108.    The net result of Defendants' failure to comply with Section 8(a)(4) of the NVRA is to raise the cost and lower the effectiveness of the mailing and door-to-door programs of those who, like BI and the political groups and candidates it supports, rely on Illinois' voter lists for voter information.

109.     As money gets tight across the board, BI has had to cut back on other activities. For example, BI recently cut a promotional radio spot called "Reveille," a short policy discussion each morning.   As another example, BI did not have enough money to air its radio show in December 2024 and was forced to make hard choices about what to do.  The radio show was only preserved for the month when BI's president decided to "self-fund," meaning that she contributed her own money to keep the show on the air, without any guarantee or promise of reimbursement.

110.     Inaccuracies on Illinois' voter list affect BI in another way.  Whenever BI receives a supportive email, it conducts an "email check" by finding the author's name on Illinois' voter list.  BI does this to make sure that that person is an Illinois voter, and also to allow BI to respond by focusing on local issues and candidates that are likely to interest that person.  This allows BI to more effectively engage in its core activities of public advocacy and voter outreach.  But when voter registration lists wrongly indicate that email authors are Illinois voters when, in fact, they have moved out of state, or when those lists provide the wrong local addresses, BI's public advocacy and voter outreach suffer as a result.

111.     When it conducts an "email check," BI has no immediate way to tell when an address from Illinois' voter list is incorrect.  But based on the rate of returned mailings BI and the candidates it supports have observed when they conduct mass mailings, it is likely that many addresses found on Illinois' voter list during BI's "email checks" are inaccurate.

112.     Plaintiff IFA is a 501(c)(4), non-profit political advocacy and lobbying organization dedicated to preserving and advancing the interests of family, faith, and freedom in the political arena.  It is the non-profit and tax-exempt legislative action arm of the Illinois Family Institute.

113. IFA has no full-time employees, and a limited budget. It has to make hard choices about how to use its limited resources.

114. IFA publicly endorses and supports candidates who support its core principles.

115. IFA's core activities include engaging in public advocacy and education about its core issues, and contacting voters to encourage them to assist the causes and candidates IFA supports by contributing, volunteering, and voting.

116. All voter address lists used by IFA to contact Illinois voters are ultimately based on Illinois' official voter list. The Illinois voter list itself is always the least expensive way to reach out to voters.

117. IFA's ability to conduct its core activities has been made more difficult because Illinois' voter rolls contain more outdated and ineligible registrations than they would if Defendants complied with Section 8(a)(4) of the NVRA.

118. IFA uses a telephone call service that makes automated telephone calls to deliver recorded messages concerning issues or candidates IFA cares about. The telephone calls are to lists of voters derived from Illinois' official voter lists.

119. IFA is able to reach fewer voters by means of these automated calls than it would if Defendants complied with Section 8(a)(4) of the NVRA. This impairs IFA's ability to effectively perform its core activities of public advocacy and education and reaching out to voters.

120. IFA periodically sends mailings concerning specific issues or elections to every voter in a geographic area, using addresses derived from Illinois' official voter lists.

121. A significant proportion of IFA's mailings are returned as undeliverable because the addressee no longer lives at the stated address.

122.     The proportion of mailings to addresses from Illinois' voter list that is returned as undeliverable is greater than it would be if Defendants complied with Section 8(a)(4) of the NVRA.

123.     The cost of mailings to addresses taken from Illinois' voter list that are returned as undeliverable is an economic loss to IFA.

124.     Because of the additional costs of mailings caused by Defendants' failure to comply with Section 8(a)(4) of the NVRA, IFA obtains fewer results from mailings than it would if the voter rolls were better maintained.  That is, it costs more money to contact fewer voters, either by mail or in person.  This impairs IFA's ability to effectively perform its core activities of public advocacy and education and reaching out to voters.

125.     Carol J. Davis has been a dedicated political actor for at least ten years.  She has supported a variety of causes and has served in a variety of political organizations, as a member, including as a member of Judicial Watch; as a volunteer; and as an officer, including as Chairman of the Illinois Conservative Union.

126.     Ms. Davis has become aware of problems affecting Illinois' voter list maintenance efforts.

127.     Ms. Davis has served as a poll watcher, and also as a poll worker and election judge, in DuPage County, Illinois, and hopes to do so again.  In those capacities, she observed several instances where clearly invalid voter registrations remained on the rolls.

128.     Ms. Davis observed the Illinois legislature fail to adopt a bill sponsored by Rep. Deanne M. Mazzochi which merely provided that county clerks shall, rather than may, issue certifications of death records for death registrations and use that system to cancel the registration of any person who has died during the preceding month.

129.    Ms. Davis is a knowledgeable observer of Illinois' politics and of its list maintenance programs.

130.    Ms. Davis is aware of several reports of possible deceased registrants voting and requesting mail ballots in Illinois in the 2020 and 2016 general elections.

131.    Due to the failure of Defendants to maintain accurate and current voter registration rolls in Illinois, Ms. Davis' confidence in the integrity of the electoral process is undermined.

132.    Plaintiff Judicial Watch's mission is to promote transparency, integrity, and accountability in government and fidelity to the rule of law. The organization, which has been in existence since 1994, fulfills its mission through public records requests and litigation, among other means.

133.    Judicial Watch is supported in its mission by hundreds of thousands of individuals across the nation. An individual becomes a member of Judicial Watch by making a financial contribution, in any amount, to the organization. Members' financial contributions are by far the single most important source of income to Judicial Watch and provide the means by which the organization finances its activities in support of its mission. Judicial Watch in turn represents the interests of its members.

134.    Over the past several years, Judicial Watch's members, including Carol J. Davis, have become increasingly concerned about the state of the nation's voter registration rolls, including whether state and local officials are complying with the NVRA's voter list maintenance obligations. They are concerned that failing to comply with the NVRA's voter list maintenance obligations impairs the integrity of elections by increasing the opportunity for ineligible voters or voters intent on fraud to cast ballots.

135.    In response to the concerns of its members, Judicial Watch commenced a nationwide program to monitor state and local election officials' compliance with their NVRA list maintenance obligations.  As part of this program, Judicial Watch utilizes public records laws to request and receive records and data from jurisdictions across the nation about their voter list maintenance efforts.  It then analyzes these records and data and publishes the results of its findings to the jurisdictions, to its members, and to the general public.

136.    Defendants' failure to comply with their NVRA voter list maintenance obligations burdens the federal and state constitutional rights to vote of individual members of Judicial Watch like Carol J. Davis by undermining their confidence in the integrity of the electoral process, discouraging their participation in the democratic process, and instilling in them the fear that their legitimate votes will be nullified or diluted by ineligible votes.

137.    Protecting the voting rights of Judicial Watch members who are lawfully registered to vote in Illinois is germane to Judicial Watch's mission.  It also is well within the scope of the reasons why members of Judicial Watch join the organization and support its mission.

138.    Because the relief sought herein will inure to the benefit of Judicial Watch members who are lawfully registered to vote in Illinois, neither the claims asserted nor the relief requested requires the participation of Judicial Watch's individual members.

139.    Plaintiffs Judicial Watch, Illinois Family Action, and Carol J. Davis were denied access to a category of public records concerning Illinois' "programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" that Plaintiffs were entitled to access under the NVRA.

**COUNT I**

**(Violation of Section 8(a)(4) of the NVRA, 52 U.S.C. § 20507(a)(4))**

140.     Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

141.     Plaintiffs Judicial Watch, Illinois Family Action, Breakthrough Ideas, and Carol J. Davis are persons aggrieved by a violation of the NVRA, as set forth in 52 U.S.C. § 20510(b).

142.     Defendants have failed to fulfill their obligations under Section 8(a)(4) of the NVRA to conduct a general program that makes a reasonable effort to cancel the registrations of Illinois voters who have become ineligible by reason of a change of residence.

143.     Defendant Matthews has failed in her duty as Illinois' Chief State Election Official to coordinate State responsibilities under the NVRA.

144.     Plaintiffs have suffered and will continue to suffer irreparable injury as a direct result of Defendants' failure to fulfill their obligations under the NVRA.

145.     Plaintiffs have no adequate remedy at law.

**COUNT II**

**(Violation of Section 8(i) of the NVRA, 52 U.S.C. § 20507(i))**

146.     Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

147.     Defendants have failed to fulfill their obligations under Section 8(i) of the NVRA to make available to Plaintiff Judicial Watch "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters."

148.     Plaintiff Judicial Watch has suffered, and will continue to suffer, irreparable injury as a direct result of Defendants' failure to fulfill their obligations under Section 8(i) of the NVRA.

149.     Plaintiff Judicial Watch has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for entry of a judgment:

a.      Declaring Defendants to be in violation of Section 8(a)(4) of the NVRA;

b.      Permanently enjoining Defendants from violating Section 8(a)(4) of the NVRA;

c.      Ordering Defendants to develop and implement a general program that makes a reasonable effort to remove the registrations of ineligible registrants from the voter rolls in Illinois;

d.      Declaring that the NVRA supersedes and preempts any contrary Illinois law or practice;

e.      Declaring that Defendants have violated Section 8(i) of the NVRA by refusing to allow Plaintiffs to inspect and copy the requested records;

f.      Permanently enjoining Defendants from refusing to allow Plaintiffs to inspect and copy the requested records;

g.      Ordering Defendants to pay Plaintiffs' reasonable attorney's fees, including litigation expenses and costs; and

h.      Awarding Plaintiffs such other and further relief as this Court deems just and proper.

November 29, 2024

    s/ Christine Svenson
Christine Svenson, Esq.
(IL Bar No. 6230370)
SVENSON LAW OFFICES
345 N. Eric Drive
Palatine IL 60067
T: 312.467.2900
christine@svensonlawoffices.com

T. Russell Nobile
JUDICIAL WATCH, INC.
Post Office Box 6592

Paul J. Orfanedes (IL Bar No. 6205255)
Robert D. Popper*
Eric W. Lee
JUDICIAL WATCH, INC.
425 Third Street SW, Suite 800
Washington, DC 20024
Phone: (202) 646-5172
porfanedes@judicialwatch.org

*  Admitted pro hac vice

Gulfport, Mississippi 39506
Phone: (202) 527-9866
rnobile@judicialwatch.org