**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JUDICIAL WATCH, INC., ILLINOIS FAMILY ACTION, BREAKTHROUGH IDEAS, and CAROL J. DAVIS ) ) ) ) | |
| Plaintiffs, ) | |
| ) | No. 24 C 1867 |
| v. ) | |
| ) | Judge Sara L. Ellis |
| THE ILLINOIS STATE BOARD OF ELECTIONS, BERNADETTE MATTHEWS, In her capacity as the Executive Director of The Illinois State Board of Elections, ) ) ) ) | |
| ) | |
| Defendants, ) | |
| ) | |
| ILLINOIS ALF-CIO and ILLINOIS FEDERATION OF TEACHERS ) ) ) | |
| ) | |
| Intervenor-Defendants. ) | |

## OPINION AND ORDER

Plaintiffs Judicial Watch, Inc., Illinois Family Action ("IFA"), Breakthrough Ideas, and

Carol J. Davis sued the Illinois State Board of Elections (the "Board") and Bernadette Matthews,

in her official capacity as the Board's acting executive director (together with the Board, the

"State Defendants"), asserting violations of Section 8(a)(4) and 8(i) of the National Voter

Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20501 *et seq.* Plaintiffs allege that the State

Defendants failed to satisfy their voter list maintenance obligations under Section 8(a)(4) of the

NVRA and that their refusal to provide Plaintiffs with requested information on voter

registration violates Section 8(i) of the NVRA. Plaintiffs request declaratory and injunctive

relief to compel the State Defendants to comply with their voter list maintenance and

informational obligations under Section 8 of the NVRA.

After Plaintiffs sued, the Illinois AFL-CIO ("AFL-CIO") and Illinois Federation of Teachers ("IFT," with AFL-CIO, the "Intervenor Defendants," and, with the State Defendants, "Defendants") moved to intervene in this case. The Court granted their motion. *See* Doc. 52. Defendants moved to dismiss Plaintiffs' complaint, and the Court granted those motions in part, dismissing Plaintiffs' Section 8(a)(4) claim for lack of standing, and denied those motions in part as to Plaintiffs' Section 8(i) claim. *See* Doc. 69. With leave from the Court, Plaintiffs filed an amended complaint.

Now, the State Defendants and the Intervenor Defendants separately move to dismiss Plaintiffs' amended complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Defendants argue that Plaintiffs lack standing to bring their claims and, alternatively, that their amended complaint fails to state a claim. Because Judicial Watch and Davis do not have standing regarding the Section 8(a)(4) claim and the Section 8(i) claim fails to state a claim, the Court finds it appropriate to dismiss the Section 8(i) claim, Judicial Watch, and Davis from this case. However, IFA and Breakthrough Ideas do have standing and have adequately stated a Section 8(a)(4) claim, such that the Court grants in part and denies in part Defendants' motions to dismiss.

**BACKGROUND[1]**

I.      **NVRA Statutory Background and State Parties**

Congress adopted the NVRA, which regulates voter registration, to "protect the integrity of the electoral process" and "to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(3)–(4). Among other things, the NVRA requires States to

---

[1] The Court takes the facts in the background section from Plaintiffs' amended complaint and the exhibits attached thereto, and presumes them to be true for the purpose of resolving Defendants' motions to dismiss. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013).

"conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" death or a change in residence.[2]  *Id.* § 20507(a)(4).  The NVRA otherwise prohibits States from removing names from the voter rolls unless the individual voter requests their removal, state law requires removal, or the State removes the individual voter pursuant to a mandatory removal program.  *Id.* § 20507(a)(3). Further, the NVRA requires the U.S. Election Assistance Commission ("EAC") to annually "submit to the Congress a report assessing the impact of this chapter on the administration of election for Federal office."  *Id.* § 20508(a)(3).

Section 8(i) of the NVRA provides for public disclosure of certain voter registration activities.  *Id.* § 20507(i).  Specifically, Section 8(i)(1) provides:

> Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

*Id.*  Section 8(i)(2) specifies that "records" "include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made."  *Id.*

Illinois designated the Board, an independent state agency, as the responsible party for supervising the administration of voter registration and election laws throughout Illinois.  The

---

[2] The Court notes that the United States submitted a Statement of Interest "addressing the requirements under the NVRA for States to conduct a general program that makes a reasonable effort to remove the names of ineligible voters, and to maintain and make available for public inspection certain records concerning the implementation of NVRA-related programs and activities."  Doc. 107 at 2.  The Court has closely reviewed and considered the Statement of Interest.

Board maintains the centralized voter registration database required by the Help America Vote Act of 2002 and has authority to carry out rules necessary to implement the NVRA's prescribed voter registration form. Matthews, the Board's executive director, serves as the State's chief election official and holds responsibility for coordinating the State's compliance with the NVRA.

## II.     Non-State Parties

Judicial Watch is a not-for-profit, educational organization that seeks to "promote transparency, integrity, and accountability in government and fidelity to the rule of law." Doc. 70 ¶ 132. Judicial Watch's members make financial contributions to the organization that finance its actions in support of its mission. Judicial Watch uses public records requests to gather information from jurisdictions around the country on their voter list maintenance efforts and analyzes the public records to create publications. Judicial Watch brings its claims as an association on behalf of its members.[3]

Davis is a member of Judicial Watch, and a resident and registered voter in DuPage County, Illinois. Davis has served as a poll watcher, poll worker, and election judge in DuPage County, Illinois, and hopes to serve in similar roles in the future. "In those capacities, she observed several instances where clearly invalid voter registrations remained on the rolls." *Id*. ¶ 127. Davis observed the Illinois legislature fail to pass a bill that would require county clerks to issue certifications of death records and to use that system to cancel the voter registration of anyone who died in the preceding month. "Davis is aware of several reports of possible deceased registrants voting and requesting mail ballots in Illinois in the 2020 and 2016 general elections." *Id.* ¶ 130.

---

[3] Judicial Watch no longer alleges that it has organizational standing. Rather, it asserts that it has standing on behalf of its members.

IFA is a 501(c)(4), non-profit, political advocacy and lobbying organization with the goal of "preserving and advancing the interests of family, faith, and freedom in the political arena." *Id.* ¶ 112. IFA endorses and supports political candidates. In support of its public advocacy and education goals, IFA contacts voters to seek contributions, volunteers, and votes. IFA periodically sends mailings to voters in certain geographic areas or concerning specific issues. IFA receives back a significant proportion of the mailings it sends as undeliverable. All voter address lists that IFA uses to contact Illinois voters are based on Illinois' official voter list. IFA also contacts voters through an automated telephone call service and uses lists of voters derived from Illinois' official voter list to make these calls.

Breakthrough Ideas is a 501(c)(4), non-profit, policy advocacy and education organization, which seeks to "advance[] the causes of peace, prosperity, and freedom by highlighting the virtue of taxpayer-centric and liberty-focused policies and how they benefit all community members." *Id.* ¶ 83. Breakthrough Ideas engages in public advocacy and education through communications with voters, such as mailings and door-to-door "walk programs." *Id.* ¶ 85. Specifically, Breakthrough Ideas periodically engages in targeted mailings concerning specific issues or elections, or works with political groups in setting up mailings. Breakthrough Ideas receives back a significant proportion of its mailings as undeliverable. Breakthrough Ideas uses voter address lists to contact Illinois voters that are based on Illinois' official voter list. Breakthrough Ideas' "walk programs" pay employees to go door to door to contact voters and involve payment to the employees on a "per door" basis, regardless of whether they contact the voter they intended to reach. *Id.* ¶ 94. At a large percentage of the addresses visited on "walk programs," there is no answer. At some addresses visited on "walk programs," a current resident

of the address answers the door but states that the person sought does not reside at the address. BI's "walk programs" also rely on voter addresses from Illinois' voter list.

Because mailings and "walk programs" cost relatively more, Breakthrough Ideas and its affiliates have relied more heavily on social media and billboards. Breakthrough Ideas cannot use social media to contact every voter. Specifically, Breakthrough Ideas is often not able to reach older voters on social media, and older voters are "often invested in politics and are willing and financially able to contribute." *Id.* ¶ 102. Billboards also do not reach every voter, as only those voters driving by them will see them.

Breakthrough Ideas also contributes money directly to its preferred candidates. Breakthrough Ideas knows that its preferred candidates rely on Illinois' voter lists for their own programs seeking to contact voters for contributions, volunteers, and votes.

Due to financial constraints, Breakthrough Ideas has cut back on some activities. For example, Breakthrough Ideas recently cut a promotional radio spot called "Reveille," which would involve a short policy discussion in the morning. *Id.* ¶ 109. Breakthrough Ideas also cut its funding for its radio show in December 2024, resulting in Breakthrough Ideas' president funding the show with her own personal money.

When Breakthrough Ideas receives a supportive email from an individual, it checks the email author's name against the Illinois voter list, seeking to verify that the person is an Illinois voter. Breakthrough Ideas then uses the information from the Illinois voter list to respond to the author's email, focusing on local issues and candidates. Breakthrough Ideas conducts research on the people who send it supportive emails to support its public policy goals. Based on the rate of returned mailings, Breakthrough Ideas has found that it is likely that the addresses of many

people who have sent Breakthrough Ideas supportive emails contained on the Illinois voter list are not accurate.

AFL-CIO is an organization consisting of more than one thousand unions, which collectively represent close to one million workers in Illinois. AFL-CIO expends resources to encourage its members to vote in every election. IFT is an affiliated union within AFL-CIO. IFT represents over one hundred thousand schoolteachers and school-related personnel, including retired teachers.

AFL-CIO and IFT have an organizational interest in avoiding adverse reallocation of resources to protect the voting rights of their members, as well as an associational interest in protecting their members from unlawful removal from the voter rolls. *See* Doc. 52 at 8–12. AFL-CIO and IFT claim that Plaintiffs' requested relief will impair these interests because their members face a high risk of improper removal from the voter roll due to housing insecurity and the migratory nature of their employment and/or schooling.

## III.    The EAC Report

On June 29, 2023, the EAC published its biennial NVRA-related report along with States' responses to a voter registration survey from the EAC. States, with assistance from county and local officials, directly certified their answers to the voting survey with the EAC.

According to the EAC report, eleven Illinois counties removed zero voter registrations pursuant to Section 8(d)(1)(B) of the NVRA from November 2020 to November 2022. Further, twelve other Illinois counties removed fifteen or fewer voter registrations pursuant to Section 8(d)(1)(B) during the same period. These combined twenty-three counties "reported a total of 980,089 voter registrations as of November 2022." Doc. 70 ¶ 30. Additionally, thirty-four other Illinois counties did not report any data regarding Section 8(d)(1)(B) removals to EAC. The

survey indicated "data not available" for those counties. *Id.* ¶ 38. Nineteen of these thirty-four counties also did not report any data on registrations that were removed from the voter registry due to the death of the registered voter.

Section 8(d)(1)(B) of the NVRA is critical in this case because it permits a State to remove a name from the voter rolls on the grounds that the registrant has changed residence if the voter fails to respond to a notice and has not voted in two consecutive federal elections. *See* 52 U.S.C. § 20507(d)(1)(B). Based on Plaintiffs' experiences, the low numbers of removals under Section 8(d)(1)(B) in the twenty-three counties mean that Illinois is not making a reasonable effort to remove ineligible voters as the NVRA requires. The EAC also stated that twenty-nine Illinois counties did not report any data regarding the number of notices sent pursuant to the removal process described in Section 8(d)(1)(B). Further, twenty-two Illinois counties did not report any data regarding inactive voter registrations from November 2020 to November 2022.

## IV. Judicial Watch's Communications with the State Defendants

On August 4, 2023, Judicial Watch sent Matthews a letter asking her to confirm that the removal numbers from the twenty-three counties identified in the EAC report as removing fifteen or fewer voter registrations were accurate, and, if not, to provide the correct data. Judicial Watch also requested that Matthews provide the missing county and city-level data on removals, confirmation notices, and inactive registrations. Judicial Watch indicated the letter was a "public records request seeking records related to the accuracy of the voter registration list," rather than a pre-suit notice of violation. Doc. 70-1 at 1. The letter "requested six categories of public records pursuant to Section 8(i) of the NVRA." Doc. 70 ¶ 53.

On September 1, 2023, the State Defendants sent a responsive letter to Judicial Watch, explaining that "Illinois is a bottom up jurisdiction, where local election authorities are responsible for inputting, maintaining, and cancelling voter registration records for their jurisdictions" such that the local election authorities would maintain many list maintenance records. Doc. 70-2 at 1. The Board stated it would produce some records but that it did not possess documents responsive to Judicial Watch's request for a list of the names and addresses of all persons to whom local election officials sent notices required by Section 8(d)(1)(B). The State Defendants directed Judicial Watch that "[a]ny request for more information . . . should be made directly to the local election authority." *Id.* at 2. Further, the State Defendants stated that "Illinois law also tasks [the Board] with cross-referencing the statewide voter registration database against the United States Postal Service's National Change of Address database twice each calendar year and sharing the finding with the election authorities." *Id.*

On November 15, 2023, Plaintiffs sent Matthews a letter notifying her of the alleged NVRA violations and threatening to bring a lawsuit if she did not cure the violations within ninety days. *See* Doc. 70-3 at 1. The letter alleged a violation of the NVRA based on the EAC report that indicated Illinois counties removed an insufficient amount of voter registrations according to Section 8(d)(1)(B) and a failure to provide records pursuant to Section 8(i).

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(1) challenges the Court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The standard of review for a Rule 12(b)(1) motion to dismiss depends on whether the defendant raises a facial or factual challenge. *Silha v.* ACT, Inc., 807 F.3d 169, 173 (7th Cir. 2015). If a defendant challenges the sufficiency of the allegations regarding subject matter jurisdiction—a facial challenge—the Court "must accept all

well-pleaded factual allegations as true and draw all reasonable inferences" in the plaintiff's favor. *Id.* "[W]hen evaluating a facial challenge to subject matter jurisdiction," the Court employs the *Twombly–Iqbal* "plausibility" standard, "which is the same standard used to evaluate facial challenges to claims under Rule 12(b)(6)." *Id.* at 174.

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

### I.    Standing

The Court begins with standing, which "'is a threshold question in every federal case because if the litigants do not have standing to raise their claims the court is without authority to consider the merits of the action.'" *Meyers v. Nicolet Rest. of De Pere, LLC*, 843 F.3d 724, 726 (7th Cir. 2016) (quoting *Freedom From Religion Found., Inc. v. Zielke*, 845 F.2d 1463, 1467 (7th Cir. 1988)). To establish standing to seek injunctive relief, Plaintiffs must allege (1) "an actual or imminent threat of suffering a concrete and particularized 'injury in fact,'" which

10

(2) Plaintiffs can fairly trace to the defendant's conduct and that (3) a favorable judicial decision will likely prevent or redress. *Common Cause Ind. v. Lawson*, 937 F.3d 944, 949 (7th Cir. 2019). "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016); *see also Groshek v. Time Warner Cable, Inc.*, 865 F.3d 884, 887 (7th Cir. 2017) (no standing for "a statutory violation completely removed from any concrete harm or appreciable risk of harm"). Plaintiffs must demonstrate standing with respect to each individual claim. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) (courts should "insist that a plaintiff must demonstrate standing separately for each form of relief sought" (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983))).

The NVRA provides a private right of action to any person "aggrieved by a violation" of the NVRA if, after providing written notice of the violation to the State's chief election official, the State has not corrected the violation within ninety days of receipt of such notice. 52 U.S.C. § 20510(b). "Standing under the NVRA is limited to the United States Attorney General and the 'aggrieved persons' whose voting rights have been denied or impaired." *Krislov v. Rednour*, 946 F. Supp. 563, 566 (N.D. Ill. 1996) (citing *Roberts v. Wamser*, 883 F.2d 617, 621 (8th Cir. 1989)) (holding unsuccessful candidates did not have standing to bring a claim under the NVRA).

## A. Violation of Section 8(a)(4) of the NVRA (Count I)

### 1. Individual and Associational Plaintiffs

Defendants argue that Davis and Judicial Watch, as an association representing its members, each lack standing because they have not alleged concrete or particularized injuries that satisfy the injury in fact requirement. Davis and Judicial Watch each assert that the State Defendants injured Davis, and Judicial Watch through its members, because State Defendants'

11

actions "undermin[e] their confidence in the integrity of the electoral process, discourage[e] their participation in the democratic process, and instill[] in them the fear that their legitimate votes will be nullified or diluted by ineligible votes." Doc. 70 ¶ 136. Defendants argue that this assertion of injury is only a generalized grievance, which is not sufficiently concrete or particularized to establish standing. Further, Defendants argue that Judicial Watch lacks standing because its individual members, including Davis, lack standing and Judicial Watch only possesses standing to the extent that its members would possess such standing. Plaintiffs respond that the Supreme Court has recognized that "public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008) (upholding Indiana's Voter ID requirements because States have a significant governmental interest in preventing voter fraud). Plaintiffs also point out that based on *Crawford*, a court in the Southern District of Indiana held that individual State residents had standing to sue under the NVRA based on their claimed injury of decreased confidence in the voting system, and that some other courts have reached similar conclusions. *See Judicial Watch v. King*, 993 F. Supp. 2d 919, 924 (S.D. Ind. 2012); *Judicial Watch v. Griswold*, 554 F. Supp. 3d 1091, 1102–03 (D. Colo. 2021) (finding that allegations that NVRA violations undermined an individual's confidence in the electoral process, discouraged their participation, and instilled fear that votes would be nullified or diluted was an injury in fact); *Green v. Bell*, No. 3:21-cv-00493, 2023 WL 2572210, at *4 (W.D.N.C. Mar. 20, 2023) (holding that where plaintiffs alleged that defendants' violations of the NRVA diluted their own votes, undermined their confidence in the State's elections, and burdened their right to vote, they had adequately stated an injury in fact for standing purposes).

12

"[A]n association may have standing solely as the representative of its members." *Warth v. Seldin*, 422 U.S. 490, 511 (1975) (citing *Nat'l Motor Freight Ass'n v. United States*, 372 U.S. 246, 247 (1963)). To have standing as a representative, the "association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Id.* Therefore, if the association's members do not have standing, the association does not have standing as their representative. *Democratic Party of Wis. v. Vos*, 966 F.3d 581, 586 (2020) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)) ("The Party's associational standing claim can be resolved easily: because the Party's members do not have standing to sue in their own right, the Party does not have standing to sue on their behalf.").

A plaintiff cannot obtain standing by alleging a generalized grievance. *See Bost v. Ill. State Bd. of Elections*, 114 F.4th 634, 640 (7th Cir. 2024), *cert. granted*, --- S.Ct. ---, 2025 WL 1549779 (Mem.), at *1 (June 2, 2025). The Supreme Court has "consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573–574 (1992).

Davis and Judicial Watch only assert general grievances that are not sufficient to establish an injury in fact, such that they lack standing for purposes of their Section 8(a)(4) claim. The Court notes that there are conflicting answers to this question of what qualifies to provide standing. *See Mussi v. Fontes*, No. CV-24-01310, 2024 WL 4988589, at *3 (D. Ariz. Dec. 5, 2024) (accumulating cases and noting the disagreement among courts). However, this Court agrees with the majority of courts to address this issue that confidence in the electoral

13

process and resulting fear of dilution of votes and loss of enthusiasm for the democratic process alleged here are generalized grievances that are not sufficient for standing purposes. *See, e.g.*, *id.* at *3–9; *Republican Nat'l Comm. v. Benson*, 754 F. Supp. 3d 773, 786–88 (W.D. Mich. 2024) (finding that individual plaintiffs alleging NVRA violations lacked standing where their claimed injuries were fears of ineligible voters voting, dilution of their votes by ineligible voters, and an undermining of their confidence in the integrity of elections); *Republican Nat'l Comm. v. Aguilar*, No. 2:24-cv-00518, 2024 WL 4529358, at *3–8 (D. Nev. Oct. 18, 2024) (finding that plaintiffs lacked standing to bring NVRA claims premised on alleged injuries of fear of vote dilution and loss of confidence in the integrity of elections).

Further, this Court is bound by the Seventh Circuit's decision in *Bost.* 114 F.4th at 640.[4] In *Bost*, the Seventh Circuit decided a standing issue where some individual voters asserted the State accepting "many purportedly 'untimely' mail-in ballots" would injure them because "the strength of their votes will be diluted." *Id.* at 640. The *Bost* court reasoned that this was a generalized injury because, to the extent that the challenged action would dilute plaintiffs' votes, "their votes would be diluted in the same way that every other vote cast in Illinois prior to Election Day would be diluted." *See id.* The *Bost* court also distinguished this sort of vote dilution claim from racial gerrymandering and malapportionment cases, finding that the *Bost* plaintiffs did not suffer similarly individualized injuries based on race or congressional district. *See id.* at 640–41. That reasoning in *Bost* is instructive here where Davis and Judicial Watch raise a similarly generalized alleged injury of fear of vote dilution. The risk of vote dilution that

---

[4] The Court notes that the Supreme Court has granted a petition for writ of certiorari in Bost. *See Bost v. Ill. Bd. of Elections*, No. 24-568, --- S.Ct. ---, 2025 WL 1549779 (Mem.), at *1 (June 2, 2025). However, at the time of this Court's opinion, the Supreme Court has not issued its opinion and so this Court remains bound by the Seventh Circuit's opinion. *See, e.g.*, *Flanagan v. Allstate Ins. Co.*, 242 F.R.D. 421, 431 (N.D. Ill. 2007) ("When deciding a matter of federal question, a district court is bound by the decisions of the Circuit Court of Appeals of the circuit in which it sits, as well as by the Supreme Court.").

Davis and Judicial Watch advance is the same among all valid voters of Illinois. *See id.* at 640. Additionally, Davis and Judicial Watch's alleged injuries are even less concrete than the alleged injury in *Bost* because Davis and Judicial Watch do not allege that any actual vote dilution occurred in any particular election, rather they argue that individuals' *personal fears of potential vote dilution* are sufficient for standing. *See Baysal v. Midvale Indem. Co.,* 78 F.4th 976, 977 (7th Cir. 2023) ("[W]e have held that worry and anxiety are not the kind of concrete injury essential to standing."); *see also Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 619–20 (2007) (Scalia, J., concurring) (explaining how a taxpayer's mental displeasure about the use of their tax money was a psychic injury that was a generalized grievance, not sufficient for standing).

The new allegations that Plaintiffs added to the amended complaint regarding Davis do not change this outcome. Plaintiffs have added new facts regarding Davis' involvement in politics, observations of invalid voter registrations on the Illinois voter rolls, and that Davis "is aware of several reports of possible deceased registrants voting and requesting mail ballots in Illinois in the 2020 and 2016 general elections." Doc. 70 ¶¶ 125–30. While these new facts add detail to Plaintiffs' allegations, they do not change that Davis and Judicial Watch's alleged injuries are about personal anxieties and loss of confidence resulting from generalized injuries, which are not sufficient for Article III standing. Because Davis and Judicial Watch have not adequately alleged that they possess standing to bring their Section 8(a)(4) claim, the Court grants Defendants' motion to dismiss this claim as to Davis and Judicial Watch.

## 2. Organizational Plaintiffs

The Court next turns to whether the organizational plaintiffs, IFA and Breakthrough Ideas, have standing. IFA and Breakthrough Ideas allege two theories of standing: (1) direct,

15

economic damages from needing to expend additional funds and resources due to the State

Defendants' actions; and (2) injury from diverting resources due to the State Defendants' actions.

The standing inquiry for organizational plaintiffs is the same as the inquiry for individuals:

organizations must establish an injury in fact, causation, and redressability. *Havens Realty Corp*

*v. Coleman*, 455 U.S. 363, 379 (1982).

Organizations demonstrate an injury in fact if they show that "defendants' conduct

impaired (i.e., 'directly affected and interfered with') their ability to" conduct their business or

services "(i.e., a 'core business activity')." *Nat'l Fair Hous. All. v. Deutsche Bank Nat'l Tr.*, No.

18 C 839, 2025 WL 975967, at *7 (N.D. Ill. Mar. 31, 2025) (citing *Havens*, 455 U.S. at 379;

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 396 (2024)). Under certain circumstances, an

organization can use its diversion of resources from one aspect of its mission to another to

demonstrate an injury. *See Havens*, 455 U.S. at 379; *Common Cause Ind.*, 937 F.3d at 951–53

(discussing the organization's diversion of resources as one form of the broader economic

injury). However, as the Supreme Court elaborated in *Alliance for Hippocratic Medicine*, a

defendant does not have standing based purely on "a setback to the organization's abstract social

interests" and "cannot spend its way into standing by simply expending money to gather

information and advocate against the defendant's action." *All. for Hippocratic Med.*, 602 U.S. at

394. Further, "organizations [do not] have standing based solely on the baseline work they are

already doing. They 'cannot convert ordinary program costs into an injury in fact.' The question

is what additional or new burdens are created by the law the organization is challenging."

*Common Cause Ind.*, 937 F.3d at 955 (citations omitted).[5]

---

[5] The Court agrees with *National Fair Housing Alliance* that "*Common Cause* does not conflict with *Hippocratic Medicine*, and the standing principles articulated in *Havens* remain authoritative." 2025 WL 975967, at *7.

To illustrate this concept, it is helpful to compare *Havens*, where the Supreme Court found that the plaintiff organization had standing, with *Alliance for Hippocratic Medicine*, where the Supreme Court found the plaintiff organization lacked standing. In *Havens*, the plaintiff organization argued that defendant's racial steering practices frustrated its "efforts to assist equal access to housing through counseling and other referral services." 455 U.S. at 379. In *Alliance for Hippocratic Medicine*, the plaintiff medical associations challenged the FDA's actions regarding regulation of a drug, mifepristone, and alleged they incurred costs to oppose the defendant's actions through conducting their own studies on mifepristone; engaging in public advocacy and education; and drafting citizen petitions to the FDA. *See* 602 U.S. at 397, 394. The Supreme Court explained the difference between the alleged injuries in *Havens* and *Alliance for Hippocratic Medicine*:

> Critically, HOME not only was an issue-advocacy organization, but also operated a housing counseling service. And when Havens gave HOME's employees false information about apartment availability, . . . Havens's actions directly affected and interfered with HOME's core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer.

> That is not the kind of injury that the medical associations have alleged here. FDA's actions relaxing regulation of mifepristone have not imposed any similar impediment to the medical associations' advocacy businesses.

> At most, the medical associations suggest that FDA is not properly collecting and disseminating information about mifepristone, which the associations say in turn makes it more difficult for them to inform the public about safety risks.

602 U.S. at 395. In sum, the Supreme Court distinguished between actions that interfere with an existing core business activity or service of an organization, and actions that the organization takes in opposition to a policy or action to serve the organization's "abstract social interests." *See id.*; *Havens*, 455 U.S. at 379.

With this guidance in mind, the Court turns to IFA and Breakthrough Ideas' allegations in this case. IFA and Breakthrough Ideas each allege that their core business activities include directly reaching out to members of the public for advocacy through different media, including mailings, walk programs, and telephone calls. IFA and Breakthrough Ideas also both allege that they rely on the Illinois voter list to engage in these activities, and that, because of the State Defendants' actions, they are not able to contact as many voters as they could if the State Defendants followed the NVRA. For example, IFA and Breakthrough Ideas receive back a significant proportion of the mail they send to registered voters as undeliverable. This amounts to an allegation that IFA and Breakthrough Ideas have existing core business activities and that the State Defendants' actions interfered with that activity in a tangible way. Plaintiffs have also alleged that IFA and Breakthrough Ideas have changed their approach in response to the impairment to their marketing strategy, and have used more social media and billboard marketing.

The Court finds that this is the sort of organizational injury sufficient for standing pursuant to the Supreme Court's guidance in *Havens* and *Alliance for Hippocratic Medicine.* Like in *Havens*, IFA and Breakthrough Ideas perform certain specific activities that they allege that the State Defendants impeded through their actions, and have alleged a concrete and demonstrable injury to those activities, namely that IFA and Breakthrough Ideas do not reach as many voters through mail, telephone, and walk programs. *See Havens*, 455 U.S. at 379 ("If as broadly alleged, petitioner's steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered an injury in fact."). In *Alliance for Hippocratic Medicine,* the Supreme Court clarified further that providing "false information about apartment

availability" "perceptively impaired" HOME's ability to provide information about apartment availability in *Havens*. 602 U.S. at 395. Similarly here, the allegation is that the State Defendants provided IFA and Breakthrough Ideas with inaccurate or outdated voter information, which Plaintiffs claim the State Defendants had a statutory duty to update, impairing IFA's and Breakthrough Ideas' ability to effectively and efficiently use mail, telephone, and walk program communications, and driving them to change their activities and turn to other forms of marketing. *See id.*

IFA and Breakthrough Ideas have alleged facts sufficient to support that this is more than an attempt to recoup their ordinary operational costs. Based on the Plaintiffs' allegations, it appears that IFA and Breakthrough Ideas identify individuals that they wish to contact through their communications programs, and then they rely on the Illinois voter list to make that contact, which costs them money. Plaintiffs allege that, due to the State Defendants' alleged violations, IFA and Breakthrough Ideas waste money and employee time attempting to contact individuals who have died or nor longer live at the address listed on the Illinois voter list and had the State Defendants legally complied to keep the list updated, they would not have had to divert resources to using less effective billboards or social media marketing to reach those individuals. *See Common Cause Ind.*, 937 F.3d at 955 (finding that organizations showed standing where they alleged that the defendants' actions "effect on their work goes far beyond 'business as usual.' They have done so through concrete evidence showing that [the challenged action] is already disrupting their operations, and if it goes into effect, it will likely require them significantly to change or expand their activities"). Simply put, Plaintiffs allege that the State Defendants' conduct impedes their core business function of contacting a specific set of voters for purposes of public advocacy, and as a result they have diverted their funds into other efforts. *See id.* at

954 (explaining that an organization showed standing where the defendants concretely disrupted their operations such that they needed to divert time and money in response). Of course, this says nothing about whether the State Defendants actually have a duty to provide IFA and Breakthrough Ideas a list of voters with any specific degree of accuracy. But as an initial matter, under the prevailing standards for organizational standing, IFA and Breakthrough Ideas have alleged adequate injuries to plead standing.

The Intervenor Defendants additionally assert that Plaintiffs have not shown that IFA and Breakthrough Ideas' injuries satisfy the traceability and redressability elements of standing. They argue that the State Defendants did not direct their alleged wrongful conduct at Plaintiffs, IFA and Breakthough Ideas' connection to the alleged violations is too tenuous to support standing, and that their alleged injury of incorrect voter data in the voter rolls would exist even if the State Defendants properly maintained the voter rolls. To show that a plaintiff's injury is fairly traceable to the defendants' challenged actions, "there must be a causal connection between the injury and the conduct complained of." *Dep't of Ed. v. Brown*, 600 U.S. 551, 561 (2023) (citation omitted). More specifically, in cases involving governmental regulations and actions, "the plaintiff must show a predictable chain of events leading from the government action to the asserted injury—in other words, that the government action has caused or likely will cause injury in fact to the plaintiff." *All. for Hippocratic Med.*, 602 U.S. at 385. Further, for the redressability requirement, the plaintiff must show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Brown*, 600 U.S. at 561 (citation omitted) (internal quotation marks omitted).

At this phase, because the Court accepts Plaintiffs' factual allegations as true and makes all reasonable inferences in their favor, Plaintiffs have adequately established traceability and

redressability for standing purposes. Breakthrough Ideas and IFA adequately allege a predictable chain of events between the State Defendants' alleged wrongful actions and their injury. Specifically, Breakthrough Ideas and IFA allege that they rely on the official Illinois voter registry for some forms of their marketing, receive fewer results from their marketing than they would if the State Defendants better maintained the voter rolls, and allege that the State Defendants possess a legal duty to do so. Again, this case is distinguishable from *Alliance for Hippocratic Medicine*, where the Supreme Court found that the plaintiff organizations lacked standing, because what Breakthrough Ideas and IFA have alleged here is not simply the government creating more work for them or where Breakthrough Ideas and IFA created new activities or programs to oppose a government program. *See* 602 U.S. at 391, 394–95. Further, based on Plaintiffs' allegations, the Court could redress Breakthrough Ideas and IFA's alleged injuries because the Court could order the State Defendants to take certain actions with regard to the voter roll maintenance, which would in turn increase the accuracy of the voter roll, and decrease the amount that inaccurate voter roll information obstructs Breakthrough Ideas and IFA from contacting voters.

The Court also cannot accept, at this phase of the litigation, Defendants' factual assertions that the Postal Service may have returned Breakthrough Ideas and IFAs' mail for reasons other than a change of address or that the same issues with the voter rolls would exist if the State Defendants did not commit the alleged violations due to the statutory waiting period. Plaintiffs specifically allege that Breakthrough Ideas and IFA receive back mail as "undeliverable because the addressee no longer lives at the stated address" and receive "fewer results from such expenditures than they would if the voter rolls were better maintained." Doc. 70 ¶¶ 91, 100, 121, 124. These are factual assertions that this Court cannot assess at this time.

21

*See Silha*, 807 F.3d at 173 ("In reviewing a facial challenge, the court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff."). Because IFA and Breakthrough Ideas adequately allege standing, the Court denies Defendants' motions to dismiss them from this lawsuit on that basis.

**B.      Violation of Section 8(i) of the NVRA (Count II)**

The State Defendants also allege that Judicial Watch does not have standing for Count II, brought under Section 8(i) of the NVRA. The State Defendants recognize that "this Court denied this section of their earlier motion to dismiss" but "ask that the Court reconsider its previous decision" and seek to preserve this issue for appeal. Doc. 80-1 at 19. Plaintiffs oppose this argument and rely on their previous briefing.

The State Defendants reassert their arguments that Judicial Watch did not suffer an informational injury because the State Defendants did not deny Judicial Watch access to any information and rather informed Judicial Watch that the Board did not keep the requested information and directed Judicial Watch to local election authorities. Further, the State Defendants argue that Judicial Watch must allege downstream consequences to have standing and that Judicial Watch cannot identify any such downstream consequences from the State Defendants' alleged statutory violation.

Section 8(i) requires States to "maintain for at least 2 years" and "make available for public inspection . . . all records concerning the implementation of programs and activities conducted" to comply with the NVRA. 52 U.S.C. § 20507(i). Courts have recognized that "the NVRA provides a public right to information." *Project Vote/Voting for Am., Inc. v. Long*, 752 F. Supp. 2d 697, 703 (E.D. Va. 2010). A State's failure to provide access to it can inflict on a plaintiff a sufficiently particularized injury in fact to confer standing. *See FEC v. Akins*, 524

22

U.S. 11, 21 (1998) ("[T]his Court has previously held that a plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." (citation omitted)). However, "[a]n asserted informational injury that causes no adverse effects cannot satisfy Article III" standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 442 (2021) (citation omitted) (internal quotation marks omitted).

As this Court explained in its previous opinion, Judicial Watch asserts an informational injury based on the public disclosure requirements of Section 8(i) of the NVRA. Additionally, Plaintiffs allege that Judicial Watch carries out its mission of "promot[ing] transparency, integrity, and accountability in government and fidelity to the rule of law" through public records requests, which the State Defendants' allegedly denied. *See* Doc. 70 ¶ 132. It is a reasonable inference that the State Defendants' failure to provide some of the information Judicial Watch requested, assuming the law entitled them to that information, harmed their goals. *See Kubiak*, 810 F.3d at 480–81 ("We accept as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff [at the motion to dismiss stage]."). Altogether, Judicial Watch sufficiently alleged an informational injury that caused it adverse effects, and the Court finds that Judicial Watch has standing to proceed on its Section 8(i) claim. *See Atkins*, 524 U.S. at 21 (finding that plaintiffs alleged an adequate injury where defendant refused to make certain information public and "[t]here [was] no reason to doubt their claim that the information would help them" with their goals).

Further, the issue of whether the State Defendants' referral of Judicial Watch to county-level officials amounts to a violation of Section 8(i) is a merits question, not a standing question. *See United States v. Funds in the Amount of $239,400*, 795 F.3d 639, 645 (7th Cir. 2015) ("They may or may not succeed on the merits, but that is a different matter [than whether parties have

standing].”); *Sierra Club v. U.S. E.P.A*, 774 F.3d 383, 389 (7th Cir. 2014) (“In reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims.” (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2023))); *Project Vote*, 752 F. Supp. 2d at 704 (rejecting defendants’ argument that plaintiff did not have standing because plaintiff did not have a right to the information requested because that argument “improperly conflates the threshold standing inquiry with the merits of the plaintiff’s claim” (citation omitted)).  The Court accepts Plaintiffs’ adequate allegations of Judicial Watch’s Section 8(i) standing and denies the State Defendants’ request to dismiss the claim on that basis.

## II.    Sufficiency of the Allegations

### A.    Violation of Section 8(a)(4) of the NVRA (Count I)

Section 8(a)(4) of “the NVRA requires States ‘to conduct a general program that makes a reasonable effort to remove the names’ of voters who are ineligible ‘by reason of’ death or change in residence.”  *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018) (quoting 52 U.S.C. § 20507(a)(4)).  Courts have found that the NVRA contains a safe harbor provision, specifying certain minimum actions a State can take to meet the requirement to make a reasonable effort to remove voters who have become ineligible because of a change of address. *See, e.g.*, *Bellitto v. Snipes*, 935 F.3d 1192, 1203 (11th Cir. 2019).  This safe harbor provision provides that:

> (1) A State may meet the requirement of subsection (a)(4) by establishing a program under which—
>
> (A) change-of-address information supplied by the Postal Service through its licensees is used to identify registrants whose addresses may have changed; and

> (B) if it appears from information provided by the Postal Service that—
>
> (i) a registrant has moved to a different residence address in the same registrar's jurisdiction in which the registrant is currently registered, the registrar changes the registration records to show the new address and sends the registrant a notice of the change by forwardable mail and a postage prepaid pre-addressed return form by which the registrant may verify or correct the address information; or
>
> (ii) the registrant has moved to a different residence address not in the same registrar's jurisdiction, the registrar uses the notice procedure described in subsection (d)(2) to confirm the change of address.

52 U.S.C. § 20507(c)(1). The notice procedure in Section 8(d)(2) requires "a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address, together with a notice" containing certain information on how to confirm or update the voter's registration if they remain in the jurisdiction, and information on how the registrant can continue to be eligible to vote if they moved outside of the jurisdiction. *Id.* § 20507(d)(2). Additionally, as described above, Section 8(d)(1) limits when a State can remove a voter from the voter rolls for changing residence, and provides that a State cannot remove a registrant for changing address unless either (1) the voter confirms in writing that they have moved outside of the jurisdiction; or (2) the voter fails to respond to the notice described in Section 8(d)(2) and has not voted in the two general elections following when the State sent the voter the notice. *Id.* § 20507(d)(1).

Defendants argue that Plaintiffs have failed to state a Section 8(a)(4) claim because they fail to plausibly allege that Illinois' existing process falls short of a reasonable effort under the NVRA, Illinois' process falls within the NVRA's safe harbor provision, and Plaintiffs' reliance on the EAC data dooms their claim because EAC only covers a two year period, which is less

than the statutory removal period contained in Section 8(d)(1). Plaintiffs argue that they have stated a plausible claim, it is not appropriate to dismiss the case based on the safe harbor provision because factual issues exist regarding whether Illinois' actions fall within that provision, it is not appropriate for the Court to rely on unsworn statements in the State Defendants' letter attached to the complaint, and pointing to the EAC data is sufficient for this stage of the case.

The Court begins with the safe harbor issue, and agrees with the majority of other courts to face this question that it is not appropriate to determine the issue at this phase because "the Court has no information about [the state's] compliance" with its procedures, even if its procedures meet the safe harbor provision requirements, and "further development of the record' is needed." *Green v. Bell*, No. 3:21-cv-00493, 2023 WL 2572210, at *5 (W.D.N.C. Mar. 20, 2023) (quoting *Griswold*, 554 F. Supp. 3d at 1108–09); *see also Voter Integrity Proj. NC, Inc. v. Wake Cnty. Bd. of Elecs*., 301 F. Supp. 3d 612, 620 (E.D.N.C. 2017) ("Whether [the government entity]'s compliance is sufficient to satisfy the 'safe harbor' provision is best resolved after further development of the record."). The Intervenor Defendants assert that Illinois' system is consistent with the safe harbor requirements, but they do not direct the Court to any authority to support that Illinois has created such a system or that Illinois actually complies with any such system, even if it is in place. The Court cannot accept this conclusory argument.

The State Defendants rely on their letter to Judicial Watch on September 1, 2023, which Plaintiffs attached to the amended complaint, as support for the argument that they comply with the safe harbor provision. They argue that the letter proves that because Illinois law requires the Board to cross-reference the voter list against the Postal Service's change of address database, they satisfy the safe harbor provision. This argument fails for two reasons. First, while the letter

describes the legal requirements for the State Defendants, it does not provide any information on whether the State Defendants actually performed these duties, and as such there is nothing to suggest that the State Defendants properly qualify for the safe harbor. The State Defendants argue that "[o]rdinarily, we presume that public officials have properly discharged their official duties." *See, e.g.*, *Banks v. Dretke*, 540 U.S. 668, 696 (2004). However, Plaintiffs allege that the public officials did not properly administer their duties, and this is ultimately a factual issue not proper for resolution at this time. *See Green*, 2023 WL 2572210, at *5. Second, even if the letter did support that the State Defendants carried out their duties and the Court can consider documents attached to a complaint in resolving a motion to dismiss, that does not mean that the Court should accept all the facts contained in documents attached to the complaint as true, unless the plaintiffs assert the veracity of their contents or the parties do not dispute the documents' veracity. *See Guzell v. Hiller*, 223 F.3d 518, 519 (7th Cir. 2000) (explaining that by attaching a document to a complaint, "[t]he plaintiff's purpose in attaching an exhibit to his complaint determines what assertions if any in the exhibit are facts that the plaintiff has incorporated into the complaint" and which the court should accept as true). In sum, the Court does not find it appropriate to determine at this phase whether the State Defendants fall within the safe harbor provision.

Next, the Court assesses whether Plaintiffs stated a plausible claim that the State Defendants have not made a reasonable effort to remove ineligible voters. Plaintiffs largely use facts from the latest EAC report, outlined above to support their arguments. Specifically, Plaintiffs point to data from eleven Illinois counties that reported to EAC that they removed no voter registrations from November 2020 to November 2022, and twelve other counties that removed fifteen or fewer voter registrations during the same period. Plaintiffs argue that because

these counties report a total combined number of voter registrations exceeding 980,000 and, according to census data, over 11% of Illinois residents are not living at the same residence as they were one year ago, the counties' removal numbers are "absurd" and evidence that they cannot be conducting a program that makes a reasonable effort to cancel registrations of voters who change residences. *See* Doc. 70 ¶¶ 28–32. Plaintiffs also compare the twenty-three counties who reported fifteen or less voter registration removals with some other counties in Illinois with less voter registrations and significantly higher rates of removal of registrations. *See id*. ¶¶ 35–36. Further, Plaintiffs point to the fact that thirty-four other jurisdictions in Illinois did not report any data to EAC regarding removals under Section 8(d)(1)(B) from 2020 to 2022, and that twenty-nine counties did not report any data regarding the number of Section 8(d)(2) notices sent out during the same time period to support that their failure to report data "suggests non-compliance with the NVRA." *See id.* ¶¶ 38–41. Finally, Plaintiffs point to data from the EAC report stating that twenty-two Illinois counties did not report any data regarding inactive voter registrations from November 2020 to November 2022, claiming this "establishes a statewide failure to conduct a general program that makes a reasonable effort to cancel the registrations of voters who become ineligible by reason of a change of residence." *Id.* ¶¶ 46–47.

The Court finds that Plaintiffs have asserted facts sufficient to state a claim that the State Defendants violated Section 8(a)(4) of the NVRA. Altogether, Plaintiffs' comparisons between the EAC data and census data, if accepted as true, support an inference that the State Defendants have not made reasonable efforts to remove voters who have relocated. *See Griswold*, 554 F. Supp. 3d at 1108 (finding that where plaintiffs compared EAC report data showing that certain counties removed significantly fewer voters than census data showed had relocated, that evidence supported that a plaintiff had adequately stated a Section 8(a)(4) claim). Other courts

28

have found that county-based data, compared with census data, that plaintiffs allege are abnormal or impossible if a county was complying with its statutory obligations can suffice to state a claim at this stage, and that any fact disputes about the reliability of the data or what inferences the data truly supports are best reserved for the summary judgment stage. *See, e.g.*, *id.*; *Green*, 2023 WL 2572210, at *5 (finding that plaintiffs adequately stated a claim where "[t]he complaint alleges that at least forty counties in North Carolina have registration rates that are abnormally or impossibly high compared to the rest of the state and the rest of the country").

Defendants dispute whether the Court can reasonably infer from the data Plaintiffs' highlight in the amended complaint that the State Defendants have not made reasonable efforts because other data in the EAC report supports that the counties that Plaintiffs highlight as having absurd or impossible removal rates did remove thousands of ineligible voters due to those voters leaving the jurisdiction. However, at this stage, this Court is charged with making all reasonable inferences in favor of the Plaintiffs, and comparing the data the State Defendants emphasize with the data Plaintiffs emphasize raises factual questions that are not appropriate for the Court to resolve at the pleading stage. *See, e.g.*, *Green*, 2023 WL 2572210, at *5 ("[T]he fact-intensive dispute about the accuracy and significance of the Plaintiffs' statistics must be resolved at the summary-judgment stage or at trial.").

This case is also materially distinguishable from the two cases in which courts granted motions to dismiss because plaintiffs relied on inadequate data or factual assertions. First, in *Judicial Watch, Inc. v. Pennsylvania*, a court found that the plaintiff did not plausibly allege that the defendants violated their Section 8(a)(4) obligations where the plaintiffs relied on out-of-date EAC data, and the most recent EAC data "marked higher numbers of Section 8(d)(1)(B) registration removals" in the counties that plaintiffs had emphasized. 524 F. Supp. 3d 399, 405

(M.D. Penn. 2021). Further, when the plaintiffs attempted to raise complaints about the up-to-date EAC data and asserted that the Section 8(d)(1)(B) removal rate should match or approach the rate at which individuals change residence in the State, the court rejected that argument and reasoned that "Section 8(a)(4) does not require a perfect removal effort," using two-year averages when the Section 8(d)(1)(B) process requires an individual to not vote in two general elections is unhelpful, and that the law does not support that the rate of Section 8(d)(1)(B) removals should match or approach the rate at which people move. *Id.* at 407. Here, the parties do not dispute that the EAC data is up to date and Plaintiffs do not argue that the Section 8(d)(1)(B) removal rate should match or approach the rate at which people move, rather Plaintiffs point to what they assert are dramatically low Section 8(d)(1)(B) removal rates, not even approaching one percent of the number of residents who were likely to have moved.[6] Second, in *Republican National Committee*, a court rejected plaintiffs' comparisons of 2022 population data to 2024 voter registration rates and their assertion that cancellations of voter registrations should match the number of residents who changed residences as conclusory. 754 F. Supp. 3d at 792. The court distinguished these claims from a case in which the plaintiff relied on a spreadsheet of voter IDs compared to death records, to show thousands of records of concern. *Id.* The court also found that census data alone could not support a NVRA violation because Section 8(d)(1)(B) contemplates a two general election removal period. *Id.* at 792–93. This case is distinguishable as well because here, Plaintiffs develop their analysis of EAC and census data to the point that it is not conclusory and do not assert that Section 8(d)(1)(B) removal

---

[6] If the twenty-three counties contained approximately 980,000 registered voters in November 2022, and approximately 12% of Illinois voters move each year, then by 2023, approximately 120,000 voters in the twenty-three counties would have moved. The Court notes that this number does not reflect how many voters would have moved out of their previous jurisdiction or out of the state.

rates need to match the rates at which people relocate. The Court turns next to the significance of the two general election removal period, and data that does not encompass that whole period.

Defendants argue and point to *Republican National Committee* and *Pennsylvania* to support that Plaintiffs' Section 8(a)(4) claim must fail because it relies on EAC data from a two-year period, which does not show enough information when Section 8(d)(1)(B) contemplates a process to remove voter registrations after a voter does not vote in two general elections. The Court understands two-year data has limitations because no single voter could be properly removed under the Section 8(d)(1)(B) procedure in two years, because the process requires the voter to have not appeared to vote for two general elections, which occur once every two years. *See* 52 U.S.C. § 20507(d)(1)(B); *see also id.* § 3101(1), (3) (defining "election" and "federal office"). However, the Court does not agree that the EAC data is entirely unhelpful or legally insufficient to form the basis for a Section 8(a)(4) claim. *Contra Pennsylvania*, 524 F. Supp. 3d at 407 (describing two-year data on removals under Section 8(d)(1)(B) as unhelpful); *Republican Nat'l Comm.*, 754 F. Supp. 3d at 793 (finding that census data could not plausibly allege a violation of the NVRA because "that cancellation rate over a short period of time would not offend the NVRA"). It is a reasonable inference that the EAC data from a two-year period would gather information about Section 8(d)(1)(B) removals that were initiated before that two-year period, and the absence of or extremely low number of Section 8(d)(1)(B) removals in EAC data from a two-year period could reflect that a State has not made reasonable efforts to maintain the voter rolls before and including that two-year period. The Court will not disregard a robust source of data on state election activities at this phase, as that would require factual conclusions the Court cannot make. *See Voter Integrity Proj. NC, Inc.*, 301 F. Supp. 3d at 619 ("[W]hile defendant-intervenors have advanced a potentially reasonable explanation for the high

31

registration rate, that being the two-election cycle waiting period to remove a registrant from the

official voter list, the validity of that explanation is not appropriate for determination at this early

stage of the litigation, where the court views the factual allegations and inferences drawn

therefrom in favor of VIP–NC.").  Therefore, altogether, the Court finds that Plaintiffs have

stated a plausible Section 8(a)(4) claim and denies Defendants' motions to dismiss on that basis.

**B.** **Violation of Section 8(i) of the NVRA (Count II)**

Finally, the parties dispute whether Judicial Watch can state a Section 8(i) claim.

Specifically, Section 8(i) provides:

> (1) Each State shall maintain for at least 2 years and shall make
> available for public inspection and, where available,
> photocopying at a reasonable cost, all records concerning the
> implementation of programs and activities conducted for the
> purpose of ensuring the accuracy and currency of official lists
> of eligible voters, except to the extent that such records relate
> to a declination to register to vote or to the identity of a voter
> registration agency through which any particular voter is
> registered.

> (2) The records maintained pursuant to paragraph (1) shall include
> lists of the names and addresses of all persons to whom notices
> described in subsection (d)(2) are sent, and information
> concerning whether or not each such person has responded to
> the notice as of the date that inspection of the records is made.

52 U.S.C. § 20507(i).  Judicial Watch alleges that Section 8(i) required the State Defendants to

provide it with the information it requested in its letter pursuant to Section 8(i) and that, as a

result, the State Defendants' letter stating that it did not possess some of the requested

information and directing Judicial Watch to local election officials violated Section 8(i).  The

State Defendants move to dismiss Judicial Watch's Section 8(i) claim because they allege that

the NVRA permits States to delegate the maintenance of voter registration records to local

election authorities, called "registrars" under the NVRA, such that the State Defendants' letter to

32

Judicial Watch, directing Judicial Watch to local election authorities, did not deny Judicial

Watch information the State Defendants were legally obligated to provide. Judicial Watch

opposes this argument and argues that the text of Section 8(i) puts the responsibility to maintain

and make the records available on the State such that directing Judicial Watch to the local

election authorities was a violation.

A court recently decided a substantially identical issue in *Committee for Massachusetts*

*Voter Identification Ballot Question v. Galvin*, --- F. Supp. 3d ---, 2025 WL 1826578, at *4–5

(D. Mass. July 2, 2025).[7] In *Galvin*, the plaintiff challenged whether Massachusetts' system

violated Section 8(i) because it delegated the disclosure of voter registration lists to local entities.

*Id.* at 3. The *Galvin* court carefully examined the text of the NVRA and case law to conclude

that the language in Section 8(i) requiring the "State" to maintain and make available could

appropriately include a State carrying out this obligation through local entities, which are

subdivisions of the State and subject to the State's control. *Id.* at *4–5. Specifically, the *Galvin*

court reasoned that "by suggesting State and local coordination and considering both the State

and its local governments responsible for implementation, Congress deliberately did not

foreclose delegation to local entities." *Id.* at *4.

The Court agrees with the reasoning in *Galvin* that a State can meet its Section 8(i)

obligation to maintain and disclose information through local election entities. The NVRA

contemplates that States will delegate certain responsibilities to local entities, but phrases many

duties as ultimately resting on the State. *See* 52. U.S.C. § 20507. Together, this suggests that

---

[7] Plaintiffs argue that the Court should not consider *Galvin* because the *Galvin* court issued its opinion at
the summary judgment stage and this Court previously found that this was not a standing question, but a
merits question, and declined to rule on the issue. The Court finds that it is appropriate to rule on this
issue at this time because the parties have now briefed the issue, and it raises a question of law that is
appropriate for resolution at the motion to dismiss stage. *See, e.g., Baines v. City of Chicago*, 584 B.R.
723, 725 (N.D. Ill. 2018) ("A court may dismiss a claim under Rule 12(b)(6) 'on the basis of a dispositive
issue of law.'") (quoting *Neitzke v. Williams*, 490 U.S. 319, 328 (1989)).

while the ultimate duty for ensuring compliance with certain parts of the NVRA rests with the State, such that the State is legally responsible for failures to comply with the NVRA, the State can delegate the operations of certain functions under the NVRA to local officials. For example, the NVRA requires that "each State shall" "conduct a general program that makes a reasonable effort to remove the names of ineligible voters . . . by reason of . . . a change in the residence of the registrant" but states that local election entities, called "registrars," can take steps to remove voters who have become ineligible through relocation. *See id.* §§ 20507(a)(4), (b)(2)(A), (c)(1), (d)(1). The NVRA permits a local election entity to send notices to voters to verify their address, receive information directly from voters about if they have moved, and change registration records to reflect a voter's new address. *See id.* Therefore, under the NVRA's express structure, a State can perform its duty to have an appropriate program to remove ineligible voters through the actions of local entities. It also follows that States can also meet their duty to maintain and make available information under the NVRA through local election entities. *See Galvin*, 2025 WL 1826578, at *4–5; *see also Voter Integrity Proj. NC*, 3401 F. Supp. 3d at 615 (finding that a party could name a local government entity as a defendant in a NVRA lawsuit because although "the particular subsections at issue are phrased in terms of state obligations . . . the NVRA also contemplates local government involvement in carrying out the State's obligations"). This interpretation also does not offend the NVRA's definition of "State" as "a State of the United States and the District of Columbia" because the State retains the ultimate legal responsibility for ensuring its local election entities carry out its duties. *See* 52 U.S.C. § 20502(4).

Because the Court finds it permissible under the structure of the NVRA for a State to delegate its Section 8(i) maintenance and disclosure duties to local election authorities, the State Defendants' letter to Judicial Watch directing Judicial Watch to request information from local

election authorities does not amount to a denial under Section 8(i), and Judicial Watch fails to state a Section 8(i) claim. *Cf. Pub. Int. Legal Found., Inc. v. Nago*, No. 23 C 389, 2024 WL 3233994, at *5–7 (finding in the context of a standing and ripeness assessment that where the defendant State directed the plaintiff to counties for the requested information, and the plaintiff had not yet contacted those counties, the plaintiff "has not yet been denied the information"). The Court grants the State Defendants' motion to dismiss this claim.

**CONCLUSION**

For the reasons stated above, the Court grants in part and denies in part Defendants' motions to dismiss [76, 80]. The Court dismisses Plaintiffs' Section 8(i) claim without prejudice, and dismisses Davis and Judicial Watch from the Section 8(a)(4) claim for lack of standing.


Dated: September 23, 2025

                                                 
SARA L. ELLIS
United States District Judge